Curia, per

Richardson, J,
The brig Amelia, Captain Dickinson, with 110 passengers, was stranded on the coast of South Carolina, in Novembei-, 1832.
*129 The plaintiff, Jarvis, was employed by J. & J. Calder, the consignees Of the Amelia, to save the cargo, and to receive salvage for his risk and trouble.
But Jarvis was to act in subserviency to the police of Charleston ; because the brig, although without the harbor, lay within about thirteen miles of the city, and the Asiatic cholera raged on board — and there was a great public alarm.
In pursuance of his undertaking, Jarvis obtained the permission of Mr. Pinckney, the Intendant of Charleston, for himself and certain other persons to enter upon the work, on the condition that they would not return to the cily without permission — and would place themselves under the command of an officer, and obey his orders.' Upon obtaining such pertíiission, Jarvis contracted with thirteen other men to assist in the work of unloading the brig. The primary contract between Jarvis and the consignees, appears by their letter to Captain Dickinson. The permission of the Intendant is given in due form, under a forfeiture of all salvage, for breach of the stipulated conditions. And the sub-contract between Jarvis and his men, recognizes the contract with tbe Calders, the prudential conditions required by the Intendant — and adds, &c. “ Should they be discharged by the officer in command, they shall forfeit all claims to such salvage.”
This final contract is signed by Jarvis and his associates, contemporaneously with the first contract and the Intendant’s permit, (3d November, 1832.) And it most clearly unités with them in constituting a specific, peculiar, and binding agreement, in' which Jarvis and his assistants place themselves under the control of the police, in order to guard against the extension of the cholera, under the penalty of the entire forfeiture of their prospective gains, which would of course, in that event, enure to the benefit of the consignees and owners.
Jarvis proceeded instantly to the wreck, landed a large part of the car" go on Folly Island, with.the consent of the Captain of the Amelia, who had acted under the express orders of the consignees, and with the obvious acquiescence of the numerous passengers.
In this state of things, on tbe 6th of November, the defendant, Knight, with a part of the City Guard, and acting under a resolution of the City Council, of which Pinckney was one, took possession of the brig and the cargo, in and out of the bull, and destroyed them by fire, for the purpose of preventing the spread of the cholera.
■ The plaintiff, (together with Captain Dickinson,) protested against the act — and Jarvis brought this action for a remuneration in money, of the entire cargo.
*130 It is seen at a glance, that the rights of more than a hundred different claimants, passengers and owners, are before the court, at least in the principle of this action. But besides involving the claims of many persons, the facts present a case of great novelty, of some public importance. And it has been, accordingly, carefully considered and luminously discussed by the counsel. The case has been connected with some of the original principles of the social compact, and with some of the leading objects of practical government. I will take up, very succinctly, the series of arguments used on both sides, in order to refer more clearly to the chief topics of law.
The right to abate public nnisances, belongs naturally to the defence— as it had been brought to bear practically upon the bng and cargo, stranded on our coast, and, of course, entitled to hospitality. But unfortunately, she carried in her hull the modern plague, which seems destined to visit the four corners of the earth, and to chastise mankind with sudden death.
There was, then, no little cause for the alarm which followed the reports of the cholera. Our protection could not be expected for a vessel bearing the pestilence, which strikes at the race of man with such fell swoop. And she was therefore destroyed by fire, as a sacrifice to public safety.
Who can blame the act so far? Not one. But with the brig, the cargo, in and out of the hull, was also burnt.
This whole trespass is justified on the part of the defendants : 1. Under the right to abate common nuisances. 2. By the eminent domain of government. 3. For the safety of the people, which is the true, and therefore the prime object of government: and 4. By virtue of the voxpopuli, which no doubt spoke out and spread terror upon the occasion. Of this last I will get rid at once, in order to take a step in clearing the way for the proper argument.
The popular voice, when it springs up from a settled public opinion, is truly as law; law yields to its correction.
But let us not connect with the authority of a settled public conviction, the sudden tremor of the alarm bell — which may rise up like the mushroom patriots described by Lord Chatham, a hundred of a night. But as She mushroom is not the parental oak, which strikes deep and rises high, spreads wide, and continues long to repress the tempest and protect his minor fellows of the forest; so the sudden loud cry of false fear is not the expression of that confident opinion of men, which incommodes some in order to ensure the general safety — restrains intemperate zeal, but urges *131 the discharge of the highest duties upon great personal responsibility for the best purpose.
And which, by the moral authority of its object, represses the law that stands in its way, and becomes itself, paramount law. There is, then, a rational philosophy in the superlative maxim, “ 'Vox populi, vox Dei," which may find a place upon some occasions: and which on the very one before us, will be found to have its proper influence, to its just and rational extent.
5. Finally — on the part of the defence, the remedy by fire has be6ti extolled, as shewn by the successful experiment made, to be the sovereign preventive against the introduction of Asiatic cholera. And the defendants claim to be acquitted altogether, or to allow the plaintiff only nominal damages — and look for the public thanks for the good done by the wholesome energy of the city authorities, and the activity of their officers. i
On the part of Jarvis, the array of argument has been no less imposing.
The protection of private property as the “sine qua non" of free governments — and the constitutional principle of just and full compensation for property taken for public uses, are pressed upon us as sacred principles in all orderly societies.
And the plaintiff demands retributive justice against the defendants, as for a debt plainly due, and not to be resisted.
On his part, the boasted remedy by fire, has been stoutly repelled and as loudly decried, as though it smelt of the fire and faggot of the bigot, Mary of England : or, as if like Pandora’s box, it was full of all sort3 of abominations.
But even here a sound discrimination was very observable — and the hope which lay at the bottom of the old box of evils to mankind, was not rejected for the plaintiff. It was fairly taken up in the ardent hope to be realized by a new trial, in a prospective verdict for fifty thousand dollars.
Some collisions were, perhaps, to be looked for, and the rather high tone of the argument on both sides was in no bad keeping with such a case. But the court must consider it in a judicial way — proceeding with rational confidence — while we pay due respect to the great doctrines connected with the case. Without favor towards our mother city, but with equal regard for her rights, and for those of the captain of the packet-boat — both are held sacred when lawful — and the law must decide the conflict between the parties.
*132 From the facts of the case the following questions of law are first pre-r sented:
1. Has Captain Jarvis a right to recover damages for the trespass committed on his rights, as bailee of the cargo, or as salvor of a part ?
2. If he can recover in either character, to what extent may he support his action?
In order to answer the first question, we are to enquire what was the position of Jarvis.
He had taken the command of the cargo upon an express agreement yvith the consignees, with the permission of the defendant, Pinckney, the consent oí .the captain, and the plain acquiescence of the passengers, in .order to save the goods, and to make a pecuniary gain for himself at the risk of his life.
Those facts amount clearly to an occupancy and possession, in right of the owners, and for their benefit, coupled with a personal interest for himself.
What character does such a position give to Jarvis ? Evidently he was an agent, standing in the place of the owners, for an important purpose, and with interests, which vested in himself as soon as he took possession, which makes him either bailee of the whole cargo or of the part he had landed, with the right of salvage. If bailees, (for instance, a factor, a carrier, or consignees — and these are adjudged cases — 2 Harp. 332. 2 Bailey, 473. 2 Saund. 47. D. N. 7 Term, 359 — 1 do. 113. s. 11, Black. 81. Buller’s N. P. 38 and 557,) can maintain actions upon their possession of goods, so confided to them, there can be little question that Jarvis stood \yithin the reasons, (possession and interest,) that such bailees have in the goods confided to their charge. And it follows that he must have his case governed by the same rule of law, and may therefore maintain the same actions.
But the second question remains : To what extent may the plaintiff recover damages ? Shall he recover to the amount of his expected reward only, i. e. for salvage, or for the value of the cargo ? Which last inquiry sub-divides itself into the question, whether for the entire cargo, or so much jas he actually saved from the wreck ?
In all the cases before noticed, the factor, the carrier, and the consignee, can sue for and recover not only for their own commissions or freight, but for the full value of the goods taken or destioyed. They are the agents of the owners, and stand as owners to all the world, but the individual proprietors themselves. But it is not allowable for strangers, who have trespassed upon the rights of possession, to set up by way of defence, a íitlp in better owners, whose c]aitns are represented by the very agents *133 that bring the action. The outstanding title of the true owners is one of the conditions of the agent’s actiou ; and the better it is proven in them the .stronger the right of the bailee to recover the whole value of the goods ; because he represents their claims jointly with his own interest in their property by virtue of his contract.
In the particular instance before us, I may add, on the part of Jarvis, that his rights as bailee are far from being lessened by the fact that he entered into the contract with the consignees, and began the work with the formal consent of one of the defendants, and the other defendant acted under the direction of the former in destroying the cargo. While in the .same degree as such privity strengthens the claims of Jarvis, it weakens the defence set up by men who infracted interests which they themselves had acquiesced in, and contributed to render, if not more lawful, at least more to be confided in by the plaintiff. Let it be here remembered that the consignees employed Jarvis with the formal consent of Pinckney — and Jaivis put himself under the conditions required by Pinckney.
It is then plain that Jarvis had a right of action as bailee of the cargo, or, at least, as bailee of so much as he had landed on Folly Island. That he has a right of action to the latter extent is the opinion of the court.
But it is still argued that there was a divided possession of the cargo between Jarvis and the owners.
On this head it is urged, that although ,the consignees gave to Jarvis the right to take possession of the whole cargo, it was only for the purpose of salvage, and therefore he is entitled to recover only for so much as he actually took out of the hull and landed in safety.'
On this last question I submit my own opinion only, on what I consider the law of bailments. It must be resolved by the import and meaning .of the agreement with the consignees, Jarvis’s agency under it, and the fact of his possession of the whole cargo.
I grant that as an. ordinary salvor, Jarvis could be in possession of no more than the part he had saved ; and therefore bailee for so much and no more. But this is by implication of law, which authorizes any man to save goods when wrecked, for the owner, with an interest vested in salvage, upon the part saved, which makes him bailee for so much and no more, But when there is an express agreement, with a named individual, there is no room for mere implication — no other person is authorized, and the agreement becomes the law of the case, and decides the extent of the bailment. Now then, what was the agreement of Jarvis with the con, signees 1 (J. & J. Calder.) In their letter to Captain Dickinson, (whicJi *134 Calder declares to be the only evidence of the agreement,) the consignees say—
“We have now engaged, with the sanction of the City Council, Capt. Charles Jarvis, of the packet boat Clara Fisher, to go down with about sixteen men, for the purpose of discharging the whole cargo upon the beach, and conveying it to such part of the Island as may be necessary to get it on board of lighters, from-. Captain Jarvis with his party, are to have the whole job to themselves, upon salvage, and no other person besides them, and yourself and crew, are to go on board of the brig.”
By this letter, we see that Jarvis was to take possession. For how else could he discharge “the whole cargo, and carry it to the island, and have the whole job” to himself and his men ? And neither the consignees nor any body else, disputes the fullness of his possession, but strangers.
According to my understanding of it, the letter plainly indicates a contract with Jarvis, to take possession for the purpose of saving the whole cargo for the owners, and to make salvage for himself and his associates in their perilous enterprise, in exclusion of alt other persons. No other person could have touched it without trespassing. But did he take practical possession of the whole cargo? To answer this, we must inquire into the facts of Jarvis’s possession. Captain Dickinson is full on this head. He says, &c., “that Captain Jarvis came down with a number of men, as salvor of the cargo,” &c. “and he and his men landed, or helped to land, all the goods landed from the brig, on Folly Island. That Jarvis toolc ¡possession of the goods as agent, fyc. of the consignees, and that the greater part of the cargo was saved from the wreck, and landed on the beach of Folly Island.”
That Jarvis, then, took possession of the caigo, in the character of an ■agent, is as evident as his contract so to do. He fulfilled it as far as in him lay; and would have completed the whole work of landing the cargo, in all reasonable probability, but for the obstruction of the defendants.
If there is any room for drawing a line of demarcation between his possession of the part landed, and the part which was burnt in the hull of the brig, it arises from his character as salvor, which is supposed to confine him to the part actually saved. For, considered as a supercargo, factor, ,or consignee, he would have been, very clearly, in possession of the whole, upon facts of possession, much less comprehensive and practical than those proven by the captain.
But was he not in possession, with a vested and even exclusive right (which was a main part of the contract,) to make salvage out of the whole p.argo ? To do the whole work upon salvage, was the very object for which, *135 with his eyes wide open to the danger, he periled life. He did not then stand on the footing of a mere gratuitous salvor.
To my understanding of the contract with the consignees, the moment Jarvis had come within the tainted atmosphere of the brig, and broke bulk, With the consent of Captain Dickinson, from that moment, neither in law nor equity, could he be ousted of his lien upon the whole cargo ; (to be measured, it is true, by salvage upon the part actually saved.) He earned and paid for his lien upon the whole cargo, the instant he breathed the cholera atmosphere; and the contract was sealed with the first package he took out of the hull.
Call him salvor or what you please, {“que heret in Uteris, heret in cortice,”) his rights in this action depend upon the investiture of rights in himself, made by the contract with the consignees, not by mere implication of law. And if such a contract was entered into, as gave him a lien on the whole cargo for the purpose of saving it, for his own advantage, in requital of the peril incurred by entering the brig, .the owners themselves could not have divested his possession, or obstructed the completion of his work, for salvage, and of course, no stranger can do so.
Such a contract was lawful, and we are to look at the object and intent of the parties; and having once seen them, and felt their binding force upon the parties themselves, no act of a stranger can alter their efficacy, or lessen the advantage of the plaintiff’s position. Call him what you will, he stood as bailee of the whole, with the exclusive right to commissions for salvage, contingent only upon the success of his own exertions; and to deprive him of the prime material upon, which he is to labor for such commissions, is to take away his commissions. It is true that his interest was usufructuary, but take away the estate, and the usufruct follows. Take away the materials, upon which his lien for salvage depended, to be measured by his success, and you take away his vested rights. Is. not this the actual estate of every carrier, consignee, factor or supercargo, in the goods confided to his charge 1 he is placed in possession of them, with a vested right to make commissions, contingent upon the prospective fulfilment of his own undertaking, to carry, to sell, or to keep safe. Jarvis stood as supercargo in possession, with the exclusive right to salvage, unless he abandoned his charge. The moment he took possession of the goods, Captain Diekinson’s superintendence over them ceased; he was Captain only of the hull, rigging and crew, and Jarvis stood as superintendant of the cargo. Is not this plainly the state of the cargo, both as between the Captain and Jarvis, and between him and the consignees 1
*136 And when the thing is plain, as between the plaintiff and the owners or consignees, who could not have ousted Jarvis, are we to be astute, in order to confine him to the ordinary rights of a gratuitous salvor, when the question is between him and strangers % and when too, one action under a more liberal view, is calculated to arrest a hundred other suits 1 For otherwise, every passenger and owner, who had something left behind in the hull, would have a right of action for his particular loss. And thus the seeds of litigation would spring out of the very principle upon which 'the case would be decided.
The question of the extent of salvage is not before the court in any respect. It belongs to another tribunal. But it is clear, that his vested right to make salvage was infracted, by destroying the goods in the hull, and the fruit of his labor and risk lessened, by so much ; which is the evil that gives a right of action for the whole cargo.
How is it, that every factor in possession, may maintain such an action before he has earned any commissions by selling the goods í It is, because he has a right to make commissions out of the goods, by selling them, and his power to sell depends upon his possession. In like manner, the power of Jarvis to make salvage, depended upon the possession given him by the Calders. Such cases are identical in principle.
They equally present the case of a bailee, who is to recover for the Owners and himself, without qualification.
In such cases, the trespasser has not the right to make advantage out of his own act; — hold the goods in his own hands, and dole out justice as Successive claimants appear. Having put himself in the wrong, he must restore the bailee to all his rights, or pay full indemnity for all the parties concerned in the action of their bailee.
For the authorities, from which I derive my conclusion, in addition to those before quoted, see 4 Term. R. 490 — 7 Term. 9 — 1 Term. 480 — 2 Bos. Pull. 44 — 1 Roll. Abr. — 2 Wils. 23 — -Com. Dig. Tit. Abatement, ■cum multis aliis.
But I have found no express adjudication, in which the commissions or interests of the bailee wore to arise by reason of labor and skill expended in saving the goods bailed to him, from the perils of shipwreck, with which they were beset, as in this case, And my reasoning of course must be from the principles and rationale of other cases of bailment, in connection with the contract made with the consignees, and the extra hazard to which the plaintiff exposed his life. It may be said, and truly, that Jarvis made no specific contract with the passengers.
*137 This may constitute an exception,'if any of them had furniture still in the brig, which is very improbable. But, at all events,- this must be the subject of evidence. And I would say, that where passengers looked on in silence, for two days, and saw the'plaintiff saving their goods, ünder a specific contract, prima facie they adopted it, if there be no counter evidence. Let it then'be a subject for proof.
Having settled the principle of law, that the plaintiff, as salvor, has a right of action to the extent of the goods actually taken out of the brig, and carried to Folly Island , and having expressed my own opinion, that the plaintiff’s rights, as bailee, might be extended to the whole cargo, in favour of the owners, whether it would operate in his own favor or not, I will proceed to consider other matter of law, upon which a majority of the court are again united. The question for consideration is now, as follows. Are the defendants justified, notwithstanding the general doctrine in favor of bailees, by reason of certain general principles of fundamental and paramount law, which arise out of the facts and character of this very peculiar case ?
It is pressed strongly, that the common safety required that both brig and cargo should be destroyed as á common nuisance. But it must be observed upon this head, that at least two opinions existed ; and the medical advisers of the City Council, and the board of health, recommended no more than thatt the vessel should be destroyed, not the cargo. And, I cannot but suspect, that the true intention was to destroy no more than so much of the cargo as remained within the vessel, and by this means, to prevent the further loss of life among desperate salvors.
The argument further urges, that the alarm being great, and the exigency calling for decisive action,- the emergency excuses the trespass; and the legal right of every man to abate a common nuisance, justifies the defendants in destroying the vessel and the cargo, whether within or without the hull.
But this is evidently too sweeping and' general a position. The part of the cargo burnt on Folly Island, had no characteristics' of a nuisance. Nor can 1 understand, that when so' removed from the brig, the goods saved from the wreck created any alarm, or indicated any danger. But in the hurry of the crisis, no distinction was made ; and that which had been part of the cargo, was balden so still.
This complex argument then, in its proper force, applies only to the brig and the goods still within her hull.
But what is a common nuisance? Hawkins, 1 v. p. 360, defines it to be “ an offence against the public,” either by doing a thing which tends to the annoyance of all the King’s subjects, or by neglecting to do a thing *138 which the common good requires. This is the established definition. if a ship be sunk in a port or haven, she may become a nuisance by obstruct* ing navigation. 2 Litt. 244. To manufacture acid spirits, sulphur, vitriol or aquafortis, in the neighborhood of dwelling houses, so as to annoy the inmates, may be a nuisance. 1 Burr. 333.
If the biig constituted a nuisance, it must have been either by obstructing the highway, or by diffusing pestilence abroad. But both of these depend upon the place of the supposed nuisance. But the mere fears of men, although reasonable, will not constitute a nuisance. 3 Atk. 21* 725 — 750.
Now, had the Amelia the essential characteristics of such a common nuisance ?
She had been thrown, by stress of weather, upon the shoals of our coast, and lay in the water unmanageable and fixed, but not in a port or haven. Did she obstruct any other vessel? No. Could she hurt any one who did not go on board of her ? No. Did she lay in the way of any people ? No.
A nuisance presupposes something noisome to the neighborhood, or dangerous to the people in their common and legitimate walks, or ob* structing common convenience.
But the Amelia contained within her hull a poisonous element, which might infect any one who went on board. But then, as much might be said of every apothecary’s shop in the city, if you will go there and absorb the poison. But seek not the poison, and you are safe; and so of the Amelia, she lay in no man’s way, and no man need go on board.
Once make the touchstone of a nuisance, to consist in any annoyance to men, from voluntary touching, tasting or smelling it, and you may, in the same way, seek out five hundred nuisances within half a mile of the court house. Not a house, when unfortunately the receptable of a loathsome disease, could escape.
And are the wreckers, or others who visited the Amelia, to cry her down, as a nuisance, by reason of their visits, when they themselves did the only act that could render the disease a common nuisance 1 The true offence, if any there be, was in their visiting her at all, at the hazard of the public health. They did an act, which, in the language of Hawkins, “ tends to the annoyance,” (nay, danger,) “of all.”
And the legal remedy was not in abating the brig, or the wreckers, but in proscribing their return to the city. And this was wisely and legally done, in the first instance.
And I must here add, that it is well for Jarvis that he represents the unfortunate owners. For, to give him Smart money, or damages, for hi» *139 disappointment in a voluntary work of such peril to himself and his fellow citizens, one cent beyond his strict right, as salvor, 1 hold out of the question.
It is well, I say, that he is bailee for other men, who are blameless, and at whose hands aloné, he deserves well, and who now claim justice for themselves, without reference to his merits or dements.
It is their rights, not Jarvis’s, which are, throughout the case, in the eye of the court, and the object of legal protection.
And, I am well persuaded, that the whole error of the verdict consisted in a confused idea, that the claims of Jarvis were the true consideration and gist of the action. Whereas, his deserts, meritorious or demeritorious, have nothing to do with it.
And pardon the reiteration, when I say that the same mistake is at the bottom of the difference of opinion among the court, upon this point. Jarvis’s name is as the mere accidental “ locus in quo” or point of union, at which all the rights of the owners meet.
And we cannot try the case upon its strict legal merits, unless we conceive aright, upon this distinction, and can abstract the case of the owners from the name of Jarvis and salvor. Only imagine, that upon the intelligence of cholera, in an unknown ship,, in the situation of the Amelia, Pinckney and Knight had gone down and burnt her and her cargo, in and out of the hull, and the sole owner had brought this action, and you then have the precise case before us.
Still there was danger that thoughtless men might go on board— catch the infection, and the disease might spread. I say it might spread : — For the contagionists and uoú-contagionists have not yet settled their controversy on the subject.
But be the truth what it may, neither the deleterious atmosphere, nor the unfortunate position of the Amelia, had been the spontaneous work of the owners — no man was to be blamed.
The supposed nuisance did not inhere in the charadter of the brigj but had been brought within her hull by misfortune ; and her position was also unavoidable. It could not then be called a nuisance.
There are two ways of getting rid of a common nuisance. One is by indictment — and that will test the principle in the present instance.
Now, 1 ask, can any oue suppose, that the captain or' owners could have been found-guilty in such a case % It would want the essential characteristic of culpability or wilfulness, and could not be made a public nuisance. The “ actus Dei” would have been a decisive justification for the defendants.
*140 There was, then, no legal right to destroy the brig or cargo as a public nuisance.
But, although no nuisance, strictly speaking,, it is still urged that, as the danger to human life was great, it might be destroyed upon the principle that private property may be taken for the public use.
This is, perhaps, the best ground on which the defence can be bottomed. It was just, safe and humane, that the evil should be removed ; and there was much reason that the defendants should undertake the removal-They have their reward in the merit of their energetic conduct, and are entitled to our thanks.
But they cannot stand justified in law upon this ground, for two reasons. 1. Because, none but the department of government which holds the practical sovereign power, can exercise the eminent domain, or right of using private property for public purposes. And 2. That, even when exercised by'the proper department, it can only be done upon just compensation.
Both the Federal and State constitutions agree in the principle of compensation. See 5, 6 and 7 arts, of amds. toU.. S, cons.; and 9 art! 2 sec, of the State cons. ■ 2 Kent’s Com- 375. 3 Story, 661. Rawle, 12.
And Chancellor Kent informs us, and no doubt with perfect truth, that the constitution of every State in the Union requires compensation as a sacred principle. And this principle must be without exception, or it becomes a mockery.
It follows then, irresistibly, .that compensation must be made to the .owners ; and they can demand it of no one but the defendants, who, doubtless, will be kept harmless by the City Council. The plaintiff might have asked compensation at their hands. He bad two legal courses within his power. To ask compensation, exgrdtice, of the Legislature or City Council, or to claim it ex debito justitim, of the defendants. He has chosen the latter, and demands strict legal justice.
But this last view unfolds the true character of the defence. The defendants acted as men on board of a ship, beset by a tempest, when it has become necessary to put a part or the whole of a cargo overboard ; and they do so in order to save ship and life. But what follows the act 1 Why, the loss must be made up by all who are saved. In mercantile language, it is an average loss, to be measured by the value of the thing destroyed. But the plaintiff must first recover, and fix the amount of the loss.
Can any man wish that the owners should not be paid for the sacrifice made of their property, in order to save the community from a possible .pestilence'? Such a thought may have glanced into the heart of a man .who thought of the danger that threatened, without reflecting that it came ¡by the fault pf no one. And well he might have said, abate the evil by *141 fire. But, if just, he would have added — we will justify the act, and make it lawful by full compensation. Our money, the loosers will have a right to ; but we have a right to saye our lives, which are jeopardized by their misfortune. In these sentiments are tobe found the whole philosophy of the constitution, and the law upon the subject.
The emergency affords an excuse for the trespass. The defendants could not be found guilty of a riot; but it is compensation alone that can justify, and make the act lawful.
But upon the subject of taking private property for public use, I have already, during the term, been so full, in the case of The State vs. Dawson, that I will do nothing more at present, than illustrate the doctrine by a fact that came out in the argument.
Mrs. Gibberson, one of the passengers and freighters of the Amelia, applied to the Legislature for compensation for her loss, and received it fully.
The highest tribunal in the State has then, taught us, by their example, that this must be an average loss. And we ought to bear the general contribution cheerfully — i. e. to the extent of the diminished value of the goods as they stood, which is the real lose of the owners. ■
But here again it may be inquired, why does not the plaintiff, for the owners and salvors, ask for such recompense of the Legislature?
The answer is, that they have a right of action against the defendants, who destroyed the property; and are not obliged to ask it of the State. The claim upon the State depends upon the necessity and public call for the sacrifice made. And the plaintiff has ch.osen to put the necessity of such an application upon the defendants.
But, as I understand the true character,' moral and object of this very suit, it is virtually an application to the city authorities, by a suit against their agents, Pinckney and Knight. And it is referred to a jury, to determine what is the amount of the loss.
This brings us to the last question in the case — namely, is the verdict for one hundred and thirty-six dollars, sufficient to satisfy the plaintiff for the loss of so much of the goods as were safely landed on the terra firma of Folly Island? The opinion of a majority of the court, confines the claim to that part of the cargo.
Upon this subject, we would say little — the valuation belongs to the jury. But it appears to the court, that the part of the cargo carried to the island, must, under the most adverse circumstances, have amounted to much more money ; and therefore, a new trial is ordered.
Chancellor Harper.
I am of opinion that the plaintiff is entitled to *142 recover, both for the owners of the property and for himself, with respect to the property saved and landed on the beach. But not with respect to the property which was not saved, but remained on board the vessel. The special property, which is the sole foundation of his action, depends upon his lien on the goods, for salvage. But can he have a lien for salvage on goods which were not saved, but remained on board the vessel, liable to perish?
If the salvors had any certain and determinate interest in the property, I should think that under circumstances, as if the owner has also brought suit, the jury might find to the extent of their actual interest only. In Williams vs. Millington, 1 Hen. Blac. 81, where an auctioneer brought suit for goods sold, and the defence was, that the defendant had paid to the owner of the goods, it was said by Loughborough, J. that if the auctioneer had given notice to the buyer, not to pay to the owner, he might in respect of lien, have recovered to the extent of his actual interest, for commissions, auction duty, and expenses. But a jury has not jurisdiction to estimate or allow salvage. That must be determined by another tribunal. That it may be properly- submitted to that tribunal, and that the plaintiff may have the benefit of his lien, it seems to me a matter of necessity, that he should recover for the owners as well as for himself.
On my construction, too, I think him entitled to recover for the other ¡salvors, as well as himself. The contract, for- salvage, was made with him. It appears to me, that the others were his agents and subordinates. It would not make any difference, that as compensation, he contracted to .allow them a share of the salvage. This, however, was matter for the jury.
The damages seem to me to have been inadequate. Yet they-might ;be within the competency of the jury, if they were properly instructed. In several cases, we have held, that where a trespass has been committed, .and property destroyed, the measure of damages is the value of the property ; and whatever circumstances of excuse, or mitigation, there may be on the part of the defendants, the jury shall not be allowed to exercise a capricious discretion in finding less than the value.
But in the case of-, decided at Columbia, we held that where ¿the trespass was occasioned or provoked by the fault or laches of the plaintiff himself, the jury may have a discretion to find even less than the value.
These decisions, I think, involve the principles applicable to this case.
However pure and laudable the motives of the defendants may have ¡been, and however necessary their act for the public safety, yet, if there tyas no wrong or neglect on the part of the plaintiff, or those he repre *143 Bents, I should think him entitled to the actual value. If there were no such fault or laches, it would be unjust, that the burden of the loss, occasioned, however necessarily, for the public safety, should fall on the owners of the property alone. But if the ship had sailed from a diseased port, and sailed, voluntarily, up to the wharf in our port, with the disease on board, and she had been there destroyed, the owners would have had no reason to complain, if in an action, for the trespass, the jury should give only nominal damages. So any other neglect or misconduct of the owners, or their agents, might have the effect of reducing them below the actual value. The owners, in this case, were liable for any misconduct of the plaintiff, whom they made their agent, by a voluntary act; and he is liable for any misconduct of his agents and associates, if an actual necessity for the destroying of the goods, were occasioned by the plaintiff’s own misconduct, or that of those in whose right he sues, he could not complain of any damages, however small, which the jury might think proper to give. If by indulging in intoxication, they occasioned the disease to spread ; if they had brought infected goods into town, or had come into town themselves, at the risk of spreading the infection — these circumstances might have been properly taken into consideration by the jury, according to what they might suppose their importance, and might have justified them in giving less than the actual value.
Upon this reasoning, I am of opinion the cause should be sent to anotlir jury-
Earle, J.
I agree with the majority of the court, who think that a new1 trial should be granted. And I perceive no material difference of opinion, concerning the grounds on which it should be sent back. Concurring with those who think that the plaintiff, on a sound interpretation of the agreement with the consignees, was entitled to maintain trespass for the cargo landed and saved, for himself, and for those who were united with him; and that he was entitled to recover the actual value, — I do not choose to consider the question, whether he was entitled to recover further. And I think it safest to express no opinion on the subject of mitigating damages, preferring to leave that question to the judge who may try the cause.